**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| JOHN ROBERTSON, individually and derivatively on behalf of CSX CORP., | Case No.: 3:18-cv-487-J-34MCR |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE AMENDED COMPLAINT** |
| vs. | |
| DONNA M. ALVARADO, JOHN B. BREAUX, PAMELA L. CARTER, STEVEN T. HALVERSON, PAUL C. HILAL, EDWARD J. KELLY, III, JOHN D. MCPHERSON, DAVID M. MOFFETT, DAVID M. RATCLIFFE, DENNIS H. REILLEY, LINDA H. RIEFLER, DONALD J. SHEPARD, MICHAEL J. WARD, J. STEVEN WHISLER, and JOHN J. ZILLMER, | **JURY TRIAL DEMANDED** |
| Defendants, | |
| CSX CORP., a Virginia Corporation, | |
| Nominal Defendant. | |

---

## VERIFIED SHAREHOLDER DERIVATIVE AMENDED COMPLAINT

Plaintiff John Robertson ("Plaintiff" or "Robertson"), by and through his undersigned counsel, alleges as follows on information and belief:

## NATURE OF THE CASE

1.     This is a shareholder derivative action brought by an investor in, and on behalf of, CSX Corporation ("CSX" or the "Company"), one of the largest railroad service providers in the United States, to recover losses and other damages against CSX Board of Directors Donna M. Alvarado, John B. Breaux, Pamela L. Carter, Steven T. Halverson, Paul C. Hilal, Edward J. Kelly, III, John D. McPherson, David M. Moffett, David M. Ratcliffe, Dennis H. Reilley,  Linda H. Riefler, Donald J. Shepard, Michael J. Ward, J. Steven Whisler, and John J. Zillmer (collectively,

the "Board" or "Defendants") for misconduct in connection with the hiring of now-deceased E. Hunter Harrison as CSX's CEO and President, and the agreement to his outrageous compensation and other demands, as detailed below.[1]

2.     CSX's Board failed to properly vet Harrison's medical condition before agreeing to his demands involving compensation, reimbursement arrangements to be made with Mantle Ridge, and the addition of conflicted Board members.  Knowing that Harrison's demands were extraordinary and outrageous, coupled with their overriding fears concerning the poor state of Harrison's health, the Board resolved to seek guidance from its shareholders and called a special meeting to do so.

3.     Yet just a few weeks later, after additional negotiations and pushback from minority shareholder Mantle Ridge LP ("Mantle Ridge"), the Board took that decision away from shareholders and approved the extraordinary and outrageous demands.  The only thing left for shareholders to weigh in on was a reimbursement arrangement whereby CSX would assume responsibility for Mantle Ridge's obligation to Harrison for benefits and consulting fees he had forgone at Canadian Pacific, plus related tax indemnity.  Shareholders would voice their opinion on this issue at the CSX shareholder annual meeting.

4.     During the months between the Board's reckless decision to hire Harrison and the annual meeting of CSX shareholders, the deterioration of Harrison's health accelerated, both in the public spotlight, and even more so behind closed doors in full view of the Board.  Instead of taking proper steps to protect CSX and offload at some of the financial risk of Harrison's hiring, the Board instead approved and disseminated false and misleading proxy statements to

---

[1]     Timothy J. O'Toole was a member of the CSX Board during some of the relevant time period of this action, but he resigned from that position before the complained-of misconduct occurred and thus is not named as a Defendant in this action.

shareholders, and in doing so ensured that the outcome of the shareholder vote regarding the reimbursement arrangement was predetermined to favor Harrison and Mantle Ridge over CSX and its shareholders.

5.      The Board's meeting minutes leading up to the June 2017 annual meeting show just how great the Board's concern had grown over Harrison's health and how, despite the Board's clear misgivings about taking on such an enormous and expensive financial risk in hiring Harrison, the Board nevertheless put the interests of Mantle Ridge and its Board representative, Defendant Hilal, ahead of the good of the Company.

6.      At the time of the shareholder vote, the Board had already ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Yet none of this information was disclosed to shareholders while they were being asked to bless the reimbursement arrangement associated with Harrison's hiring.

7.      The 2017 annual shareholder meeting took place at 10am on June 5, 2017, where, not surprisingly given the lack of material information that was disclosed to them, 93% of shareholders voted in favor of Harrison's reimbursement demands. The Board convened 90 minutes later at 11:30am, and, ████████████████████████████████

████████████████████████████████████████████████████████████

███████████

8.     On December 15, 2017, Harrison passed away.  CSX's Board knew about, hid, and outright deceived shareholders about Harrison's ill health and physical infirmities.  This deception is outrageous considering that the Board has trumpeted Harrison's singular resume and expertise as a railroad "turnaround expert" who would personally lead CSX's turnaround as he had done at other companies.   Harrison's capability of executing and implementing his "Precision Scheduled Railroading" concept within CSX during his tenure was apparently the Board's entire justification for changing its past policies and granting his excessive compensation and other demands.  Yet this "turnaround" was known to be a multi-year project, a factor that should have given the Board considerable pause about taking on such risk in light of Harrison's significant health issues.

9.     Harrison's death materially changed CSX's plans and outlook for the future.  The Board was well aware that a vibrant and fully functioning Harrison was necessary for any possible chance of success.  The Board's compensation agreement with Harrison contemplated his four-year tenure at a minimum.  With Harrison's death, CSX cannot fulfill the promises it made to shareholders.  CSX has also incurred substantial costs to retain and compensate Harrison that are lost and wasted, and it has adopted governance changes that compromised the Company's—and the Board's—integrity.  Unfortunately, the consequences from Harrison's death could have been avoided had the Board acted properly and not engaged in gross misconduct.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because, upon information and belief, there is complete diversity of citizenship among the parties.  Additionally, the amount in controversy in this case exceeds $75,000.00, exclusive of interest and costs.

11.     This verified[2] shareholder derivative action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

12.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## PARTIES

13.     Plaintiff John Robertson is a citizen of the state of Texas and is domiciled in Rockwell, Texas. He is and at all relevant times has been a beneficial owner of shares of CSX.

14.     Nominal Defendant CSX Corporation is incorporated in Virginia with its principal place of business located at 500 Water Street, 15th Floor, Jacksonville, Florida 32202, and is therefore a citizen of the state of Virginia and the state of Florida. CSX has a Board of Directors that is responsible for the oversight of its business and affairs.

15.     Defendant Donna M. Alvarado ("Alvarado") has been during the relevant period a Board member. She is a citizen of the state of Ohio and is domiciled in Granville, Ohio.

16.     Defendant John B. Breaux ("Breaux") has been during the relevant period a Board member. He is a citizen of the state of Louisiana and is domiciled in Crowley, Louisiana.

17.     Defendant Pamela L. Carter ("Carter") has been during the relevant period a Board member. She is a citizen of the state of Tennessee and is domiciled in Franklin, Louisiana.

18.     Defendant Steven T. Halverson ("Halverson") has been during the relevant period a Board member. He is a citizen of the state of Florida and is domiciled in Jacksonville, Florida.

19.     Defendant Paul C. Hilal ("Hilal") has been during the relevant period a Board member. He is a citizen of the state of New York and is domiciled in New York, New York.

---

[2]     The Verification is attached to this Amended Complaint.

20.     Defendant Edward J. Kelly, III ("Kelly") has been during the relevant period a Board member. He is a citizen of the state of Virginia and is domiciled in Charlottesville, Virginia.

21.     Defendant John D. McPherson ("McPherson") has been during the relevant period a Board member. He is a citizen of the state of Nevada.

22.     Defendant David M. Moffett ("Moffett") has been during the relevant period a Board member. He is a citizen of the state of Florida and is domiciled in Ponte Vedra Beach, Florida.

23.     Defendant David M. Ratcliffe ("Ratcliffe") has been during the relevant period a Board member. He is a citizen of the state of Georgia and is domiciled in Atlanta, Georgia.

24.     Defendant Dennis H. Reilley ("Reilley") has been during the relevant period a Board member. He is a citizen of the state of Oklahoma and is domiciled in Oklahoma City, Oklahoma.

25.     Defendant Linda H. Riefler ("Riefler") has been during the relevant period a Board member. She is a citizen of the state of New York and is domiciled in Locust Valley, New York.

26.     Defendant Donald J. Shepard ("Shepard") has been during the relevant period a Board member. He is a citizen of the state of Maryland and is domiciled in Phoenix, Maryland.

27.     Defendant Michael J. Ward ("Ward") has been during the relevant period a Board member. He is a citizen of the state of Florida and is domiciled in Jacksonville, Florida.

28.     Defendant J. Steven Whisler ("Whisler") has been during the relevant period a Board member. He is a citizen of the state of Montana and is domiciled in Whitefish, Montana.

29.     Defendant John J. Zillmer ("Zillmer") has been during the relevant period a Board member. He is a citizen of the state of Pennsylvania and is domiciled in Glenmoore, Pennsylvania.

## LITIGATION AND BOOKS-AND-RECORDS DEMAND

30.     On December 22, 2017, Plaintiff served a verified shareholder demand on the Board of CSX to take suitable action to restore integrity to CSX and recover waste incurred as a result of their reckless and grossly negligent actions in connection with Harrison's hiring and compensation which breached fiduciary duties owed to CSX pursuant to Chapter 9, Article 8.1 of the Virginia Stock Corporation Act, Va. Code Ann. § 13.1-672.1(B)(1).  The demand further sought production of CSX's relevant "books and records" pursuant to Va. Code Ann. § 13.1-771. (the "Demand").  The Demand was delivered to the Board of CSX on December 23, 2017.

31.     On February 5, 2018, through counsel, a special committee of the Board responded to the Demand indicating that it is considering the Demand.

32.     On February 7, 2018, CSX made its only production of responsive records subject to a confidentiality agreement between the parties.  CSX's production provided powerful evidence that all Defendants had knowledge of and involvement in the wrongdoing at issue.

33.     On March 13, 2018, through counsel, the special committee of the Board notified counsel for Plaintiff that it "is working diligently to investigate the facts and circumstances discussed in" the Demand but that it "does not anticipate completing its investigation [by the end of March 2018]."

34.     The ninety (90) day waiting period from the date of the delivery of the Demand until a shareholder may commence a derivative proceeding under Va. Code Ann. § 13.1-672.1(B)(2) expired on March 23, 2018.

## DEFENDANTS' MISCONDUCT

35.     CSX is one of the largest railroad service providers in the United States, with over 27,000 employees and $11 billion in annual revenues.  The company's roots can be traced back to

the early 1800's; today CSX's transportation network spans nearly 21,000 miles of track across 23 states and Canada.

36.     The Board oversees the business and affairs of CSX.  The Board holds at least five regularly scheduled meetings per year; additional meetings are held when necessary.  According to CSX's own Corporate Governance Guidelines, "[a]mong the most important functions of the Board is the selection of the chief executive officer…."

**The Board's Hiring of E. Hunter Harrison as Chief Executive Officer**

37.     On January 18, 2017, Mantle Ridge, a hedge fund run by Hilal, who was formerly at Pershing Square,[3] advised the Board that it had become a CSX shareholder of less than five percent and that it had an exclusive arrangement to work with Harrison, who left Canadian Pacific that same day.  Mantle Ridge advised the Board that Harrison was "eager to become CEO of CSX" and "in light of Mr. Harrison's experience and accomplishments, however, the CSX Board quickly engaged in extensive discussions with Mr. Harrison and Mantle Ridge."  The Board stated that there was a meeting which lasted more than five hours.

38.     At their January 24, 2017 Board meeting, ████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████

                        ████████████████████████████
                        ████████████████████████████
                        ████████████████████████████
                        ████████████████████

---

[3]     While at Pershing Square, Hilal ran the same gambit with Harrison by placing him at Canadian Pacific.  Hilal evidently sought to cash in on this routine a second time by placing Harrison at CSX.



39. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

40. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮. The February 1, 2017 meeting minutes

███████████████████████████████████████████████████████

██████████████████████████████████████████████

41.     At the Board's February 14, 2017 meeting, ████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

█████████ █ █ ███████ █ █ ████ ████ █████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████

42.     On February 14, 2017, CSX issued a press release announcing that the Board was calling for a special meeting of shareholders in connection with the hiring of Harrison as its new CEO.  The Board described how it had been approached by a shareholder acting on behalf of Harrison and the discussions to date over his hiring.  The Board even provided some information about the "extraordinary" demands necessary to procure Harrison.

43.     This information included a four-year agreement with total compensation that had an estimated cost of $300 million and significant changes to CSX's Board composition.  Included within Harrison's specific compensation demands was a request for CSX to pay $84 million as

reimbursement for payments Harrison would choose to forgo at Canadian Pacific and related tax indemnity. Harrison also declined CSX's request for a medical review by an independent medical consultant.

44.     The press release further outlined the Board's "concerns with Mr. Harrison's and Mantle Ridge's proposals[:]"

> First, the CSX Board believes that the governance requests would grant effective control of CSX to a less than 5% shareholder, which would be receiving additional benefits from CSX that may substantially exceed $100 million.
>
> Second, the economic costs of Mr. Harrison's and Mantle Ridge's employment-related proposals (which CSX estimates, with the requested reimbursement and tax indemnity, to exceed $300 million), are extraordinary in scope and structured largely as an upfront payment and as equity grants that would be payable to Mr. Harrison upon his death or disability with only a portion of the equity grant including any performance metrics. The CSX Board believes such an employment arrangement for an incoming CEO is exceptionally unusual if not unprecedented.

45.     Thus, the Board called for a special meeting of shareholders, ██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████

46.     At its February 19, 2017 meeting, ████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████

47. ████████████████ According to the Board's February 22, 2017 minutes,

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████

48. The Board then convened for a telephonic meeting on March 5, 2017, ████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████

49. Over the matter of only a few weeks' time, since their February 14, 2017 meeting

where the Board decided that ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

50.     The Board reconvened the next day, March 6, 2017, ████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

51.     ████████████████████████████████████████

████████████████████████████████████ In a press release that very same

day, the Board announced that it had hired Harrison as CEO and acceded to many of his demands.

The Board agreed to Harrison's salary and bonus demands, and it awarded him options to purchase

nine million shares of CSX stock at the current stock price, subject to certain vesting provisions.

52.     The Board also agreed to appoint Hilal and four others selected by Mantle Ridge

to the Board, which has 13 members, provided that Mantle Ridge continue to maintain a minimum

stock ownership percentage.  These new Board members, owing their position to Mantle Ridge's

intervention, would therefore be conflicted with respect to any issue involving their benefactor.

Hilal was also appointed Vice Chairman of the Board.

53.     The Board ostensibly decided to seek shareholder input on just one issue—the

demand for $84 million in reimbursement compensation and the related tax indemnity before

agreeing to these payments—rather than the host of issues surrounding Harrison's putative employment as the Board had originally announced. CSX's press release stated that "Mr. Harrison has indicated that he will resign after the 2017 meeting if the reimbursement and tax indemnity are not provided by CSX and return to Mantle Ridge to protect his reimbursements." But, by already hiring Harrison, the Board left shareholders without much agency; without fulsome disclosures regarding Harrison's health issues, the Board's concerns about taking on all of the financial risk of Harrison's retention, or the turning over of effective control of the Company to a less-than-5% shareholder, shareholders had little option left but to rubber-stamp the reimbursement agreement.

54. The Board acted recklessly and/or with gross negligence by prematurely hiring Harrison before the $84 million reimbursement issue was resolved. By deferring this issue to shareholders at the annual meeting, and informing them that he would quit if his request was not granted, the Board had effectively hired Harrison already. The shareholder vote would simply be a way for the Board to obtain cover for conceding to Harrison's excessive compensation demands; the shareholder vote would have no real power other than as a political fig leaf for the Board.

55. The Board also hired Harrison without sufficiently vetting his health condition and his physical capability of fulfilling his duties as CEO. CSX's various agreements with Harrison and Mantle Ridge contain no provisions requiring that Harrison submit to a medical review or making this a condition of his employment. Upon information and belief, all CSX employees must submit to a physical and/or health exam as a condition of their employment. The Board violated ordinary CSX employment policy by hiring Harrison without sufficient vetting or review of his health.

**False and Misleading Proxy Statements Lead to Shareholder Approval**

56.    After hiring Harrison, the Board and Mantle Ridge collaborated in a false and misleading campaign to win a shareholder endorsement of the $84 million of reimbursement compensation.    Both parties issued false and misleading statements in shareholder communications and proxy statements about Harrison's capability to deliver and implement his turnaround plans at CSX.  The Board and Mantle Ridge omitted the material fact that Harrison was in seriously ill health, which limited him physically and required use of an oxygen tank, and that, therefore, there was a high probability that his tenure as CEO would be short-lived and he would not be able to deliver and execute his strategic plans.

57.    CSX's March 6, 2017 press release to announce Harrison's hiring contained the following quotes and biographical information demonstrating how material and fundamental Harrison's capability to execute his strategy was to CSX's decision to hire him and the perceived value he would bring to the Company:

> Hunter Harrison, said "I am proud to join the dedicated and talented railroaders at CSX. Together, we will implement Precision Scheduled Railroading – a model proven to improve safety, create better service for customers, produce a proud and winning culture for employees and generate exceptional, lasting value for shareholders."
>
> Paul Hilal, said "I thank every CSX director, including those leaving the Board, for their constructive and skillful engagement that enabled this terrific outcome for CSX. The Board is united behind a shared goal – creating value for shareholders and all stakeholders by implementing the Precision Scheduled Railroading mode at CSX. Together, we have created the conditions for success. Now the real work begins."
>
> ***
>
> **E. Hunter Harrison**
>
> E. Hunter Harrison is the most effective and successful railroad leader of our times, having successfully led the turnaround of three major railroads over the last 25 years. In his last two undertakings

at Canadian National and Canadian Pacific, he delivered 321% and 350% total shareholder return, respectively.

Mr. Harrison created and refined Precision Scheduled Railroading over the recent decades, and is the acknowledged lease in implementing it as Class I railroads. He has been recognized by every major railroading publication and he has twice been honored as Railroader of the Year.

58.    On April 3, 2017, CSX, "by order of the Board of Directors," filed its preliminary proxy statement for the annual meeting which discussed the election of the newly added directors, as well as "Item 5," the shareholder vote on Harrison's compensation.  Although it took no position on the vote, CSX presented the following list of "Pros" and Cons:"

Pros:

• Mr. Harrison's prior accomplishments and past experiences generating value at Illinois Central Railroad, Canadian National Railway and Canadian Pacific;
• Mr. Harrison's experience with implementing "Precision Scheduled Railroading"; and
• Mr. Harrison forfeited substantial compensation and benefits he earned at Canadian Pacific in order to relax non-compete restrictions that would have prevented him from working at the Company, and if the Company does not provide the Reimbursement he has made clear that he will resign from CSX in order to maintain the Mantle Ridge protection against the cost of the forfeiture.

Cons:

• The magnitude of the costs associated with the Reimbursement and Mr. Harrison's compensation at the Company as described elsewhere under "*Mantle Ridge and E. Hunter Harrison Agreements*";
• The risk that Mr. Harrison may not be able to continue to serve as CEO over the course of his four-year employment agreement, whether due to death, disability or other reasons; and
• The risk that Mr. Harrison may not be able to achieve results similar to the results he was able to achieve at Illinois Central, Canadian National and Canadian Pacific.

Again, this list demonstrates that Harrison's capability of delivering on his strategy plans was material to his value to CSX, and that any inability to do so would pose a major risk.  The Board

failed to specifically disclose its knowledge of Harrison's serious health issues and physical limitations, which it knew (or was reckless in not knowing) were material to the shareholder vote, providing only the generic, boilerplate "risk" disclosure that Harrison's four-year tenure might not be completed "due to death, disability or other reasons[.]"  Such a disclosure is typical when any senior executive is hired for a multi-year engagement; it did not identify for shareholders the specific concerns that the Board regarding Harrison's major health problems and the substantial risk that he not only would not be able to complete his four-year contract, but that he might barely be able to start it.

59.    Also on April 3, 2017, Mantle Ridge filed its own preliminary proxy statement recommending that shareholders vote for Harrison's reimbursement.   Mantle Ridge stressed Harrison's past track record of turnarounds at three major railroads and states:

> He achieved these results by transforming each of these railroads from more traditional operating models to the Precision Scheduled Railroading model **he created and refined over his career**. Railroads operating under this model perform far better than railroads operating under traditional models.  **Mr. Harrison is the only person to have effected such a transformation at a Class I railroad. As CEO, Mr. Harrison intends to effect the same transformation at CSX.**

Mantle Ridge's statements emphasized that Harrison's strategy is personal to him and has not been duplicated by other CEOs.  Mantle Ridge failed to disclose any specific knowledge of Harrison's serious health issues, which it knew were material to the shareholder vote.

60.    The Board's proxy statement also failed to disclose for shareholders the Board's concern that, in light of Harrison's significant health issues, it was not appropriate for CSX to take the entirety of the financial risk in Harrison's hiring, even though such a fact also would have been material to shareholders in casting their votes.

61.     If the unique and personal nature of Harrison's Precision Scheduled Railroading had not already been made clear to the Board, it was surely done so during Harrison's presentation focusing on that very topic given at the April 19, 2017 Board meeting.  Harrison further presented his personal "strategic and operating plan changes for the Company…."  The Board also discussed, and approved, the simultaneous filing of Mantle Ridge's proxy statement with CSX's for the upcoming annual meeting.  Although the Board resolved not to make a recommendation on the reimbursement arrangement advisory vote in their own proxy materials, approving Mantle Ridge's simultaneous filing of its proxy materials with a clear recommendation in favor of shareholder approval is tantamount the Board having made the recommendation itself.

62.     On April 27, 2017, Mantle Ridge filed additional proxy materials with the SEC, which included a lengthy PowerPoint presentation to recommend that shareholders vote to "retain Harrison."      Mantle      Ridge      posted      its      presentation      on      the      website www.CSXAdvisoryVote2017.com with the apparent knowledge and approval of the Board.

63.     Mantle Ridge's presentation further reinforced the fact that Harrison's health and capability of delivering on his plans was highly material while it failed to truthfully disclose his present medical state.  Instead, the presentation made false and misleading statements to suggest that Harrison could deliver results to the Company.  Moreover, Mantle Ridge's presentation also exhibits data that reflect that his transformation (and increased value) took ***multiple years*** for sustained results.  Again, no specific disclosures were made of Harrison's serious health issues or physical limitations, which would call into question his capability to deliver on his plans over the next four years.

64.     The Board did not control Mantle Ridge's misleading proxy statements, but it was not obliged to let them go uncorrected, either.  The Board knew or should have known that Mantle

Ridge's statements would further mislead shareholders regarding Harrison's health and the risks being taken on by CSX in hiring and proposing to reimburse him, yet the Board allowed these misleading statements to influence shareholders without context, correction or rebuttal.

65.    On May 17, 2017, the *Wall Street Journal* ran an article concerning Harrison's health and his capability of performing his duties as CEO.  The article stated that Harrison used oxygen and worked from home several days per week.  The article also stated that the 72-year-old Harrison stated that doctors have given him the OK to work and that "**his fellow CSX board members are aware of his medical condition**."

66.    On May 19, 2017, in immediate rebuttal, CSX, again at the behest of the Board, filed additional proxy material in connection with its proxy statement for the shareholder vote, which stated in relevant part:

> On May 17, 2017, the Wall Street Journal published a story related to the health of E. Hunter Harrison, Chief Executive Officer and President of CSX Corporation.  In an interview, Mr. Harrison told the Wall Street Journal, "I'm having a ball and I'm running on so much adrenaline that no one can stop me."  He also said, "Don't judge me by my medical record, judge me by my performance."  Further, Mr. Harrison said, "There are times when I get a little shortness of breath so I take oxygen and it helps. Sometimes I get a cough and the oxygen makes it go away."
>
> CSX said, "In the absence of performance questions, as a matter of policy we do not comment on health related matters of any CSX executive." CSX further said Mr. Harrison "has been and continues to be actively and deeply involved on a daily basis."

67.    This filing of additional proxy materials represented yet another opportunity where the Board failed to disclose the known truth about Harrison's serious medical condition and physical limitations.  By filing the response to the *Wall Street Journal* article, the Board made clear that it knew that this issue was material to shareholders, yet it withheld the truth about Harrison's medical condition and physical limitations.  This was a material omission made worse

by the fact that the Board purported to address the issue but made no disclosure of any problem or limitation or the risk of any problem or limitation.  The Board's misleading proxy statement blunted what could have been the corrective influence of the *Wall Street Journal*'s article.

**The Board Approves E. Hunter Harrison's Reimbursement Request**

68.     On May 26, 2017 a special meeting of the Board was called. ███████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

69.     On June 5, 2017 at 10am, CSX held its annual shareholder meeting.  Based on the misleading proxy statements of the Board and Mantle Ridge, the shareholders voted in favor of electing the new directors and approving the $84 million reimbursement payment to Harrison.  At the time, shareholders still did not have the full truth concerning Harrison's health and medical condition or the Company's assumption of all of the risk concerning that condition.

70.     Just after the annual shareholder meeting, at 11:30am, the Board met. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

71.    ████████████████████████████████████████████

███████████████████████████████    At the same June 5, 2017 Board meeting, ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████    The Board was fully aware of the strong correlation between CSX's ability to properly implement Harrison's personally developed methods and its share price.

72.    Although 93% of shareholders voted in favor of Harrison's reimbursement arrangement, that vote was entered before CSX's Board had decided that ████████████████

████████████████████████████████████    Had shareholders been privy to all of the most current information regarding Harrison's health, ██████████████████

████████████████████████████████████████████████████

████████    the results would have been drastically different.

73.    The Board met telephonically on June 9, 2017 to discuss ██████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████  ████████████████████  ██████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████  ██

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████

74.    By this point, early June 2017, Harrison's reimbursement arrangement had not yet been approved by the Board.  The Board's actions clearly demonstrate its growing level of concern with Harrison's health.  It had only recently ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

75.    A special telephonic meeting the Board was called on June 14, 2017 ████████

████████████████████████████



76.     On June 16, 2017, the Board announced that it agreed to Harrison's $84 million reimbursement request.  By Harrison's own physician's report to the Board, and his own admission to the *Wall Street Journal*—which was never contradicted by CSX—**the Board had full knowledge of his health and medical condition and his physical limitations at this time**. Harrison had been at CSX for several months, and it would have been reckless and/or grossly negligent for the Company to have not known of his true medical condition.

77.     The Board's knowledge that Harrison had a serious health issue is further reflected in its June 16, 2017 Form 8-K filed to acknowledge that it had agreed to the reimbursement.  In describing the factors weighing on its decision, the Board mentioned for the first time the risks associated with Harrison's age and health.  The Board also added this generalized disclaimer (which does not acknowledge or admit any specific health condition) that never appeared in any of the preceding proxy statements or shareholder communications:

> The pace of implementing Mr. Harrison's business strategies, including Precision Scheduled Railroading, depends on numerous factors, including his continued availability and service.  Continued availability and service can never be guaranteed for any individual and is a particular risk in the case of Mr. Harrison, who is 72 years old and has experienced medical issues at various times, including a respiratory condition that requires him to use supplemental oxygen.

**An extended or permanent loss of the services of Mr. Harrison, due to death, disability or any other reason, could adversely disrupt the pace of implementing the company's Precision Scheduled Railroading, or otherwise adversely affect the Company or the market price of the Company's securities**.

(emphasis added).

78.     The Board's decision to approve the $84 million reimbursement payment was reckless and/or grossly negligent considering the state of Harrison's health.  The Board knew that Harrison's tenure would be short-lived, and that there was, therefore, an extremely high probability that he would not be able to implement his turnaround strategy.  The Board recognized this risk and sought to renegotiate the reimbursement arrangement to offload some of the financial risk of hiring Harrison; when the Board's request was turned down, however, the Board simply capitulated to Hilal and Mantle Ridge—to the detriment of CSX.

**Harrison Shocks the Market on the Second Quarter 2017 Earnings Call**

79.     On July 18, 2017, Harrison spoke on CSX's analyst conference call.  During the call he stated, "I'm a short-timer here.  I'm the interim person that's going to try to get this company to the next step and good foundation."   He also acknowledged that "I think it's very reasonable to say that we can get this done in the timeframe we talked about which is I guess 2020 we will have it done by then, I think it's very reasonable."  He also discussed a difficulty he faced that he could not recruit past members of his team who were familiar with implementing his strategies.

80.     His comments shocked the market and investors.  The *Jacksonville Business Journal* reported on his comments in an article titled "CSX CEO Drops Bombshell During Earnings Call."  CSX's stock price fell by approximately 10%.

81.     Harrison's statements to analysts sharply contradicted the primary thrust and arguments made by the Board and Mantle Ridge for shareholders to support the $84 million reimbursement payment and to elect the new directors from Mantle Ridge.  Shareholders were never advised or told that Harrison was only an "interim CEO" or that his tenure was likely to be short.  Instead, they were advised that he was necessary for CSX's turnaround plan, which would take multiple years to implement, and that no one else was remotely qualified to carry out this plan.  Shareholders were also never advised or informed of any health issues or condition that would limit his capability of executing his plans to fruition.

**Harrison's Brief Tenure as CEO Comes to an Abrupt End**

82.     On December 13, 2017, CSX abruptly announced that Harrison was taking a "medical leave" from the Company.  The leave was explained as "unexpected complications from a recent illness" and CSX's acting CEO had no timetable for Harrison's expected return.  In response to this news, CSX's stock price fell another 10%.

83.     According to a *Florida Times-Union* article dated December 14, 2017, at a Credit Suisse conference two weeks ago, Harrison hinted at a succession plan saying that he was "trying to stay back a little bit" and let other executives take more control.  "I am there to help if they need me," Harrison said, according to news reports.  "But at the same time … this company's got to be ready to deal, and it is going to be ready to deal, without Hunter Harrison.  And that's one of the steps in the succession."  Harrison's remarks evidence the Board's full awareness and preparations for his demise.

84.     On December 15, 2017, two days after announcing his medical leaver, Harrison passed away, causing further declines to CSX's stock price.  CSX's Chairman stated that the company suffered a "major loss."  Industry analysts have described Harrison as irreplaceable and

have questioned CSX's ability to continue its turnaround plans to increase operating efficiency without Harrison leading the Company.

85.     Since his hiring, the Board had championed Harrison to improve CSX's operating ratio.   The Board described Harrison as a lifelong railroad man who originated "Precision Scheduled Railroading," a concept designed to improve operating efficiency.   Harrison's capability of executing and implementing his "Precision Scheduled Railroading" concept within CSX during his tenure was apparently the Board's entire justification for changing its past policies and granting his excessive compensation and other demands.

86.     Harrison's death materially changed CSX's plans and outlook for the future. Harrison is not present and unable to execute his personally developed turnaround plans, which require a CEO with his experience and qualities to implement.  The Board was well aware that a vibrant and fully functioning Harrison was necessary for any possible chance of success.  The Board's compensation agreement with Harrison contemplated his four-year tenure at a minimum.

87.     With Harrison's death, CSX cannot fulfill the promises it made to shareholders. CSX has also incurred substantial costs to retain and compensate Harrison that are lost and wasted, and it has adopted governance changes that compromised the Company's—and the Board's—integrity.  Unfortunately, the consequences from Harrison's death could have been avoided had the Board acted properly and not engaged in gross misconduct.

## COUNT I
## BREACH OF FIDUCIARY DUTY
### (Against the Board Defendants)

88.     Plaintiff incorporates by reference and realleges each and every allegation contained above as though fully set forth herein.

89.     Defendants, members of CSX's Board of Directors, owed fiduciary duties of care and loyalty to CSX in managing its affairs. These duties are and were set forth in CSX's Corporate Governance Guildelines and its SEC filings.

90.     As alleged above, the Board Defendants each breached their fiduciary duties to CSX through willful misconduct and/or gross negligence.

91.     As a direct and proximate result of the breaches of fiduciary duty by the Board Defendants, CSX has sustained substantial harm and damage.

92.     The Board Defendants are liable to CSX jointly and severally as a result of the acts alleged herein.

93.     There is no adequate remedy at law.

## COUNT II
## BREACH OF DUTY OF LOYALTY
### (Against Defendant Hilal)

94.     Plaintiff incorporates by reference and realleges each and every allegation set forth in ¶¶ 1-87 above as though fully set forth herein.

95.     Defendant Hilal, as a member of CSX's Board of Directors, owed a fiduciary duty loyalty to CSX in managing its affairs for the sole and exclusive benefit of CSX.

96.     The duty of loyalty requires a fiduciary to avoid conflicts of interest and to resolve them promptly when they occur.

97.     Hilal is the managing member of Mantle Ridge GP LLC, which is the general partner of Mantle Ridge LP, which is the sole member of Mantle Ridge. Mantle Ridge is a minority shareholder of CSX.

98. Although Hilal had a duty to avoid conflicts of interest, he instead used his position on the Board to obtain CSX's approval of the reimbursement arrangement to secure at least $55 million of CSX funds to benefit Mantle Ridge, to the detriment of CSX.

99. As alleged above, Defendant Hilal breached his fiduciary duty to CSX through willful misconduct and/or gross negligence.

100. As a direct and proximate result of the breaches of fiduciary duty Defendant Hilal, CSX has sustained substantial harm and damage.

101. Defendant Hilal is liable to CSX as a result of the acts alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment on behalf of CSX against the Defendants, jointly and severally, as set forth herein, as follows:

(i) Declaring that this action is a proper derivative action;

(ii) Ordering each of the Defendants to pay restitution and/or compensatory damages in favor of CSX, plus prejudgment interest;

(iii) Awarding Plaintiff his costs and disbursements and reasonable allowances for fees of Plaintiff's counsel and experts and reimbursement of expenses; and

(iv) Granting Plaintiff and CSX such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby requests a jury trial for any and all Counts for which a trial by jury is permitted by law.

DATED: May 14, 2018

By: _____

Justin Sauerwald, Esq.
Florida Bar No. 95333

**ZAMANSKY LLC**

Samuel E. Bonderoff, Esq.*
Jacob H. Zamansky, Esq.*
Edward H. Glenn, Jr., Esq.*
50 Broadway, 32nd Floor
New York, NY 10004
Telephone: (212) 742-1414
Facsimile: (212) 742-1177
*justin@zamansky.com*

**pro hac vice* application forthcoming

*Counsel for Plaintiff*

**LILES GAVIN, P.A.**

R. Kyle Gavin
Florida Bar No. 747076
*kgavin@lilesgavin.com*
*jostwald@lilesgavin.com*
301 W. Bay Street, Suite 1030
Jacksonville, Florida 32202

*Local Counsel for Plaintiff*

29

## VERIFICATION

STATE OF NEW YORK  )
                    ) ss.
COUNTY OF NEW YORK  )

JUSTIN SAUERWALD, of lawful age, upon his oath being first duly sworn, states:

That he is counsel for Plaintiff herein, he has read the above and foregoing Verified Shareholder Derivative Amended Complaint and knows the contents thereof, and the statements and allegations therein contained are true and correct to the best of his knowledge.

Signature: _____
JUSTIN SAUERWALD

Subscribed and sworn to before me this 14ᵗʰ day of May, 2018.

_____
Notary Public

My Commission Expires: 3/3/19

INGRID A. SENNO
Notary Public, State of New York
No. 01SE5073641
Qualified in Westchester County
Commission Expires March 3, 20_19